The plaintiff is the beneficiary named in a policy of industrial life insurance issued to her deceased husband Walter W. Jacobs, who died February 9th, 1942, as a result of "rheumatic valvulitis and cardiac hypertrophy — auricular fibrulation then conjestive failure". She sues for the face value of the policy — $750.
The defendant insurance company denies liability upon the ground that the insured was guilty of fraud in that he "wilfully misrepresented the true condition of his health at the time he made the written application to it for the issuance of the policy."
There was judgment below in plaintiff's favor, and defendant has appealed.
The policy was issued by the defendant insurance company without medical examination and after a written application had been signed by the insured. The application contains no reference to illness and nothing which would suggest that the applicant should be rejected upon the ground of bad health. This is said to have constituted a wilful misrepresentation within the meaning of Act No. 160 of 1934, § 3, which provides that "no policy of industrial life insurance shall be void, nor shall the rights of the assured thereunder be impaired, by any misrepresentation in the application of the assured unless such misrepresentation is wilful on the part of the assured and conceals facts as to the ill-health of the assured existing at the time of any such application, and provided further, that fraud shall always be a defense against any suit by the assured, if the insurer shall have obtained an application from the assured as hereinabove provided."
It appears that Mr. and Mrs. Jacobs resided in one-half of a house, the other side of which was occupied by a Mr. and Mrs. J.A. Busha. Mr. Busha was an agent of the defendant company. The two couples were very friendly and frequently visited each other. According to Mrs. Jacobs, Mr. Busha was very persistent in his efforts to induce Jacobs to take out a policy and finally succeeded when, on May 23rd, 1941, Busha, accompanied by a Mr. Moisha Shiff, the superintendent of the defendant company, obtained the deceased's signature to the application in her living room. The answers to the interrogatories contained in the application were written by Mr. Shiff, who testified that it was the universal custom for insurance agents to write these answers and that he could not remember any case where "the man ever filled in the form". At the time the application was written Mr. Shiff says that only he, Busha, sometimes called Boucher, and the deceased were present and that it was not written in Jacobs' living room, but in his, Shiff's, automobile, while they were taking Jacobs to his place of employment, the Orpheum Theatre.
Busha's wife, who at the time of the trial, had been divorced from Busha and was married to a man by the name of Kilean, testified in substantiation of Mrs. Jacobs that the application was written in the Jacobs' living room. She and Mrs. Jacobs also stated that in answer to interrogatories propounded by Shiff, Jacobs disclosed the fact that he was under the care of Dr. Wells; that he had had pneumonia and that he had weakened his heart a little.
Dr. Wells testified that he was the attending physician during the last illness of the *Page 174 
deceased and that he first saw him on December 18th, 1940 (the application was signed in May, 1941); that at that time he was suffering from "auricular fibrulation" — in other words, heart trouble; that he had considerable difficulty in getting Jacobs to come to his office for treatment; and that he prescribed digitalis.
Busha, who was in the armed services at the time of the trial, did not appear in person and did not have his evidence taken by deposition because, it is explained by the defendant, he was inaccessible.
The trial judge held that he believed the testimony of Mrs. Jacobs and Mrs. Kilean and, therefore, concluded that both the superintendent and the agent of the defendant had knowledge of the fact that plaintiff was under the treatment of Dr. Wells for some heart affection and that, consequently, there can be no wilful misrepresentation.
In the case of Shinn v. National Travelers' Benefit Association, 1917, 102 Kan. 134, 169 P. 215, 216, it was said:
"This court by a long line of decisions is on record to the effect that, when an insurance agent seeking business and finding a prospect puts him through the categorical examination provided by the company and leaves out such answers given by him as would work a refusal of his application, and the company takes his money and issues his policy, it, and not the applicant, is held responsible for the situation thus arising. When, as testified to in this case, the customer makes truthful answers, and the paper supposedly containing them is shoved across the table to him for a signature, and he immediately signs without reading, it does not lie in the mouth of the company to criticize him for trusting the honesty of its agent in writing the answers as given. * * *
"This rule, so manifestly in accord with common sense and fair dealing, has abundant support in the decisions of other courts, and still meets with the approval of this court."
In Succession of Dekan v. Life Insurance Company of Virginia, La. App., 172 So. 37, it was held that the knowledge of the agent of an insurance company should be imputed to the insurer and that subsequent issuance of an insurance policy waives the right to claim forfeiture of the policy on the ground that the answers in the application concerning the health of the insured are false, in view of the provisions of Act 97 of 1908.
We do not know whether the superintendent who wrote the answers after interrogating Jacobs wilfully falsified them in order that the insurance might be issued and he might receive a small commission to which it is shown he was entitled, but the evidence preponderates to the effect that he knew, because Jacobs told him, that he was under the care of Dr. Wells, who was treating him for a heart ailment and no mention of that fact appears in the application. It would seem, however, that the system under which the defendant company operated, which presumably is the same as that of all other companies doing a similar business, is calculated to subject their solicitors to considerable temptation, particularly in view of the universal practice of the agents writing the application instead of the applicant. The general manager of the defendant company testified that the agents, that is to say, men like Busha, work on a strictly commission basis and that the superintendent (Shiff) gets a salary plus a small commission. There is, of course, no objection to an insurance company issuing policies without a medical examination, but when the agent, whose livelihood depends upon his obtaining policies, fills out the application with the knowledge that no medical examination of the applicant is to be made, further pressure is put upon him and a further strain upon his fidelity to his employer.
Much stress is laid upon the fact that the deceased took out two other industrial life insurance policies, one with the Monumental Life Insurance Company and one with the Metropolitan Life Insurance Company, within a year of his death and after he had discovered that his heart was affected. The other two policies were also issued without medical examination. This fact is pointed to as indicating an intention to defraud the three insurance companies involved by withholding the insured's true condition of health, for in the other two applications, as in the one before the court, no mention is made of his heart trouble. Mrs. Jacobs testified that the other two policies were obtained after the agents who filled in the application blanks were informed of her husband's true state of health, but that the applications as filled out by the agents did not reflect it. In other words, she contends that these other policies were issued under the same circumstances as the present one. She further states that the policy of the Metropolitan Life Insurance Company was *Page 175 
delivered while her husband was in the hospital. The other two insurance companies have also refused to pay Mrs. Jacobs as beneficiary.
While the procurement of these policies shortly before the insured's death might be considered as a suspicious circumstance, we are not now concerned with those other two policies and the suspicion, such as the facts justify, is not sufficient to overcome the proof that in the instant case, the defendant's agent was informed of the true state of Jacobs' health. We know of no reason why Mrs. Kilean should have testified as she did and to the effect that the defendant's agent knew of Jacobs' illness, unless she was telling the truth. The knowledge of the defendant's agent is imputed to his principal. Succession of Dekan v. Life Insurance Company of Virginia, La. App., 172 So. 37.
Our conclusion is that the judgment of the district court was correct, consequently, and
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.